1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHRISTA WALDRIP,

             Plaintiff,

   v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY,

            Defendant.

3:21-cv-05602-JHC JHC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

12

13

14

      THIS MATTER comes before the Court on cross-motions under Federal Rule of Civil Procedure 52, docket nos. 24 and 25.  Having reviewed the cross-motions and responses, as well as the Administrative Record ("AR"), docket no. 30, and having concluded that oral argument would not be beneficial, the Court enters these Findings of Fact and Conclusions of Law.

15

## **FINDINGS OF FACT**

16

17

      1.      Plaintiff Christa Waldrip was born in 1973 and is currently 49 years old. AR 2079.  In 2008, plaintiff was diagnosed with multiple sclerosis ("MS").  AR 93–96.

18

19

20

      2.      From August 14, 2017, until October 22, 2018, plaintiff worked as a Production Supervisor for Linear Technology Corporation, which was acquired by Analog Devices, Inc. (collectively, "Linear").  *See* AR 403–04 & 408.

21

22

      3.      During plaintiff's employment, Linear was a "Participating Unit" in a "Group Long Term Disability Insurance" policy ("Policy") issued by defendant Reliance Standard Life

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

Insurance Company ("Reliance").  *See* AR 1–33.  The parties do not dispute that, for purposes of the Policy, plaintiff is an "Insured."  *See* AR 9 (defining "Insured").

4.      The Policy contains the following provision:

**INSURING CLAUSE:**  We will pay a Monthly Benefit if an Insured:
(1)     is Totally Disabled as a result of a Sickness or Injury covered by this Policy;
(2)     is under the regular care of a Physician;
(3)     has completed the Elimination Period; and
(4)     submits satisfactory proof of Total Disability to us.

AR 18.

5.      The Policy defines "Totally Disabled" and "Total Disability" to mean that "as a result of an Injury or Sickness:"

(1)     during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
. . .

(2)     after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the materials duties of Any Occupation.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

AR 10.

6.      The Elimination Period is 90 straight days and begins on the first day of Total Disability.  AR 7 & 9.

7.      The Policy defines "Any Occupation" as "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience."  AR 9.

8.      Matrix Absence Management, Inc. ("Matrix") is the claims administrator for the Policy.  AR 316.  The Policy does not expressly confer discretion on Matrix to determine eligibility for benefits or to construe the terms of the Policy.  *See* AR 1–33.

9.      In 2017, plaintiff was diagnosed with carpal tunnel syndrome, which was causing shoulder and neck pain.  AR 92–96.  In August 2018, plaintiff experienced an outbreak of shingles, with symptoms of a rash and neck pain.  AR 92–94.  In December 2018, plaintiff underwent two carpal tunnel surgeries, and had a difficult rehabilitation.  *Id.*  In April 2019, plaintiff underwent spinal surgery (C3–C6 posterior laminoplasty and left C5–C7 posterior foraminotomy).  *Id.*

10.     It appears that, on or around December 7, 2018, Linear processed plaintiff's claim for long term disability ("LTD") benefits.  AR 403-05.  By letter dated November 4, 2019, Reliance notified plaintiff's counsel that plaintiff's claim for LTD benefits had been approved.  AR 297–98.  Plaintiff's disability was deemed to have begun on October 23, 2018, and her 90-day Elimination Period was satisfied on January 22, 2019.  AR 297.

11.     By letter dated April 26, 2020, Reliance advised plaintiff's counsel that plaintiff was no longer entitled to LTD benefits under the Policy.  AR 323.

12.     By a 15-page letter dated May 4, 2020, plaintiff's counsel demanded that Reliance "immediately overturn" its denial of benefits.  AR 1595–1609.

13.     On May 6, 2020, plaintiff underwent magnetic resonance imaging ("MRI") of the lumbar region.  AR 1814–16; *see also* AR 1748–49.  A registered nurse employed by Reliance summarized the MRI results as "revealing degenerative changes with mild facet hypertrophy, negative of significant canal narrowing, with faint edema to L4-5 in setting of grade 1 degenerative anterolisthesis, severe bilateral facet joint degenerative changes, with edema

1    extending into bilateral L4-5 pedicles, [which was] felt [to be] related to osteoarthritis." AR 94.

2    According to this same nurse, the MRI was "negative for documentation of MS." *Id.* Previous

3    MRIs, however, of plaintiff's brain, thoracic spine, and cervical spine, conducted in 2015 and

4    2018, resulted in "findings characteristic of multiple sclerosis." AR 1870.

5          14.    By letter dated May 18, 2020, Reliance indicated that plaintiff no longer met the

6    criteria for Total Disability because her medical records did not "objectively support her

     subjective reported symptoms" or "confirm the inability to work." AR 328–32.

7          15.    On June 17, 2020, Dana Davies, a certified family nurse practitioner ("FNP"),

8    who was plaintiff's primary care provider, authored a letter stating that plaintiff's "permanent

9    and degenerative conditions continue to progressively diminish her functional capacities," that

10   "medication side effects and other impairing conditions, both physical and psychiatric, further

11   limit [plaintiff's] occupational capacities," and that plaintiff's "chronic pain and concomitant

12   fatigue . . . would prevent her from performing with reasonable consistency in any full-time

13   capacity." AR 1784–85.

14         16.    On June 25, 2020, Elizabeth North, D.O., plaintiff's treating neurologist,

15   completed a Functional Capacity Questionnaire. AR 1770–78. Dr. North opined that plaintiff

16   (i) constantly (*i.e.*, 67–100% of the workday) experienced pain or other symptoms that interfered

17   with attention and concentration, (ii) could sit for only 10 minutes at a time and for less than two

     hours total over the course of an eight-hour workday, (iii) could stand continuously for 30

18   minutes, but could stand or walk for less than a total of one hour during an eight-hour workday,

19   and needed to walk around at 15-minute intervals for more than 15 minutes each time,

20   (iv) needed unscheduled breaks of 20 minutes every half hour to lie down, (v) would likely be

21

22

23

absent from work more than four days per month, and (vi) was totally disabled from any occupation. *Id.*

17.     On July 31, 2020, David Hoenig, M.D., a board-certified neurologist, issued a "peer" report opining, based on his review of plaintiff's medical records from December 2015 through June 2020, that plaintiff had the following functional capacity:  "she can stand and walk up to six hours, no more than one hour at a time, she can occasionally lift and carry 50 pounds and frequently 20 pounds, she can frequently bend, stoop, kneel, crouch, and crawl, and she can never climb or work around heights."  AR 1867–73.  Except as indicated, plaintiff had "no other restrictions and limitations."  AR 1873.  Dr. Hoenig noted that cognitive difficulty was mentioned, but indicated that the documentation included no "neuropsychological evaluation demonstrating objective cognitive pathology based on a primary neurological etiology."  *Id.*

18.     A vocational rehabilitation specialist characterized plaintiff's Regular Occupation (supervisor of electronics production in the electronic components industry) as "light" duty, requiring frequent walking or standing and frequent lifting, carrying, pushing, or pulling of up to 10 pounds.  AR 1874–77.

19.     By 79-page letter dated August 10, 2020, plaintiff's counsel appealed the denial of benefits, appending an eight-page declaration signed by plaintiff.  AR 2000–86.

20.     By letter dated August 19, 2020, Reliance acknowledged receipt of plaintiff's appeal, and indicated that it would send her medical records to an independent physician for review.  AR 334–35.

21.     By letter dated August 28, 2020, Medical Consultants Network provided to Reliance the dictated report of Jon Glass, M.D., a board-certified neurologist.  AR 2212–19.  Dr. Glass opined that plaintiff's "[m]ultiple sclerosis is quiescent and is not contributing to any

impairment," but plaintiff "has radicular lumbar pain, radiating to the left lower extremity with associated gait disturbance," and therefore could stand, walk, and climb stairs only occasionally (five minutes per hour over an 8-hour work day), but she could sit for eight hours per day with five minutes of standing per hour.  AR 2216–17.  Dr. Glass indicated that, with "appropriate treatment," plaintiff's lumbar pain might diminish, and he recommended a re-evaluation in early December 2020.[1]  AR 2218.

22.    On September 16, 2020, a vocational rehabilitation specialist opined that the limitations on standing and walking identified in Dr. Glass's report were inconsistent with the physical demands of plaintiff's Regular Occupation, which required standing and walking on at least a frequent basis.  AR 2259–61.

23.    By letter dated September 22, 2020, Reliance reversed its denial of benefits.  AR 337; *see also* AR 149.  Plaintiff's file was reopened and referred back to Reliance's LTD Claims Department for ongoing management of plaintiff's claim for LTD benefits.  *See* AR 337.  Plaintiff received 24 months of LTD benefits,[2] from January 22, 2019, through January 22, 2021.  AR 62–88.

24.    On September 25, 2020, a vocational rehabilitation specialist issued a Residual Employability Analysis ("REA") about plaintiff.  AR 2284–97.  The REA indicated that plaintiff graduated high school, attended one year of community college, and obtained a general

---

[1] The Court rejects plaintiff's contention that Dr. Glass's statement required Reliance to have plaintiff re-evaluated in December 2020.  Dr. Glass anticipated improvement in plaintiff's condition, and his recommendation was intended to alert Reliance that plaintiff might have better functional capacity in the future; it did not invest in plaintiff some new "right" to be evaluated.

[2] On August 13, 2020, plaintiff was diagnosed with severe major depressive disorder.  AR 2196–99.  Plaintiff does not, however, seek LTD benefits based on any mental disorder.  Under the Policy, benefits for disabilities "caused by or contributed to by mental or nervous disorders" are subject to "an aggregate lifetime maximum duration" of 24 months.  *See* AR 22.

associate's degree in 2015.  AR 2286.  The REA considered plaintiff to be proficient with

personal computers, including the use of Microsoft Office Suite, Microsoft Outlook, and Adobe

software.  *Id.*  The REA also identified certain transferable skills and abilities that plaintiff, as a

supervisor of electronics production in the electronic components industry, was likely to have:

> Use knowledge of production machine setup and adjustment.
>
> Read and understand blueprints, wiring diagrams, and other work specifications.
>
> Detect differences in shape, size, and texture for product conformance.
>
> Direct and organize the work of others.
>
> Use math skills to plan schedules and keep productions records.
>
> Use eyes, hands and fingers to handle precision instruments.
>
> Manage employees within the production floor across various production areas.
>
> Maintain daily, weekly, monthly, and quarterly databases and tracking of actual results.
>
> Responsible for coordinating and ensuring Production Operators are properly trained.

*Id.*

25.     The REA listed the following sedentary[3] occupations as ones for which plaintiff

would have the requisite educational background, vocational experience, and physical capability:

(i) industrial-order clerk; (ii) parts cataloger; (iii) procurement clerk; (iv) production clerk; and

(v) production coordinator.  *Id.*

---

[3] Sedentary was defined in the REA as "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."  AR 2286–87.  For purposes of the REA, occasionally means that the activity or condition "exists up to 1/3 of the time," and frequently means that the activity or condition "exists from 1/3 to 2/3 of the time."  AR 2287.

26.     On November 6, 2020, plaintiff completed an Activities of Daily Living ("ADL") Questionnaire.  AR 2332–50.  In the ADL Questionnaire, plaintiff indicated, among other things, that she needs assistance with dressing and grooming; uses a cane to assist with ambulation; has memory problems, but has not been formally tested for them; prepares her own simple meals (*e.g.*, cereal or sandwiches), but relies on her mother to handle most of the cooking; has a valid driver's license and can drive, but will not do so "unless absolutely necessary"; needs assistance to travel; can perform limited housework, including laundry ("very slowly"), dusting with assistance, vacuuming ("very slowly"), washing dishes, taking out the trash and recycling; and can shop for food and household items weekly, but is assisted by her mother or others in getting to and from the store.  *Id.*  Plaintiff added that she cannot sit and use a computer or mentally focus for longer than 4-to-5 minutes at a time because of her pain.  AR 2347.

27.     By letter dated December 2, 2020, Reliance advised that plaintiff would no longer qualify as Totally Disabled as of January 22, 2021, when the "Any Occupation" rather than "Regular Occupation" criterion would become effective, because plaintiff was deemed capable of at least sedentary work.  AR 359–62.

28.     On January 21, 2021, plaintiff was examined by a nurse practitioner at Columbia View Family Health in Troutdale, Oregon in connection with prescription renewals and concerns about thinning hair.  AR 2667.  With respect to a review of systems, the nurse practitioner noted that plaintiff reported "no fatigue" and "no visual disturbance."  AR 2668.  On physical examination, the nurse practitioner observed plaintiff to be "[w]ell appearing, alert and cooperative during exam, in no acute distress," with clear conjunctiva and no exudate in or near the eyes, and exhibiting a "[n]ormal gait and station."  *Id.*

29.     By 54-page letter dated March 25, 2021, plaintiff's counsel appealed the denial of benefits.  AR 2512–65.  This letter was accompanied by a second, three-page declaration by plaintiff, AR 2566–68, as well as various medical records and a Physical Work Performance Evaluation Summary by John Parr, a physical therapist employed by Therapeutic Associates | Gresham Physical Therapy ("Parr Report" or "PWPE"), AR 2661–63.

30.     The Parr Report or PWPE, dated March 1, 2021, indicated that plaintiff could sit, stand, walk, crawl, climb stairs, and climb a ladder on an "occasional" basis.  AR 2662.  The Parr Report defined occasionally as "up to 1/3 of the day."  *Id.*  The Parr Report opined that plaintiff was "unable to sustain the light level of work for an 8-hour day."  AR 2661 (emphasis in original).  It did not discuss whether plaintiff could perform sedentary work.  *See* AR 2661–63. The Parr Report did, however, rate plaintiff's manual and finger dexterity as "below average," while her grip strength was within normal limits.  AR 2662.

31.     By letter dated April 9, 2021, Reliance indicated that, to process plaintiff's appeal, it would require her to undergo an independent medical examination ("IME").  AR 363–64.

32.     By letter dated June 22, 2021, plaintiff's counsel supplied to Reliance certain medical records from plaintiff's treating neurologist Dr. North.  AR 2753–70.  The medical records contained the following notation:

> History of relapsing/remitting multiple sclerosis.  I would recommend long-term disability secondary to visual compromise, cognitive impairment, chronic pain, chronic fatigue, paresthesias, weakness and gait instability related to multiple sclerosis.

AR 2761.  On the day this notation was made, *i.e.*, June 3, 2021, Dr. North examined plaintiff and observed that plaintiff (i) was oriented to person, place, problem, and time, had an appropriate mood and affect, and exhibited a "grossly intact" memory, (ii) had normal results on a cranial-nerve evaluation, (iii) had normal results on a motor examination, (iv) had normal

1    scores (2/4) with respect to reflexes, (v) exhibited normal sensation to vibration and position, but

2    decreased sensation to pinprick on her left arm and leg, (vi) demonstrated normal coordination,

3    and (vii) displayed an "antalgic gait: left," but "ambulate[d] independently."  AR 2760.

4            33.    An IME was scheduled for June 29, 2021, with Arnold Greenberg, M.D., a board-

5    certified neurologist.  AR 2751.  At plaintiff's request, the IME was conducted virtually, via the

6    Zoom platform.  AR 110–24 & 367–68; *see* AR 2718–19 & 2729–30.

7            34.    The IME Report prepared by Dr. Greenberg applied the usual meanings for

8    "occasionally" and "frequently," *see supra* note 3 & ¶ 30, and defined "constantly" as existing

9    for "2/3 or more of the workday."  *See* AR 2806.  According to Dr. Greenberg, as of January 22,

10   2021, when the Policy's "cannot perform the material duties of Any Occupation" standard went

     into effect, plaintiff could work full time, with these abilities or restrictions:

11
12           Sitting - frequently
             Standing - frequently
             Walking - frequently
13           Lifting occasionally - 12 pounds
             Lifting frequently - six pounds
             Lifting constantly - three pounds
14           Carrying occasionally - six pounds
             Carrying frequently - four pounds
15           Carrying constantly - three pounds
             Pushing/pulling occasionally - 12 pounds
16           Pushing/pulling frequently - eight pounds
             Pushing/pulling constantly - six pounds
17           Reaching in all planes constantly (no limitations)
             Handling constantly
18           Simple grasp constantly
             Firm grasp constantly
             Fingering frequently
19
     *Id.*
20
             35.    In forming his opinions, Dr. Greenberg reviewed over 1,500 pages of plaintiff's
21
     medical records, which dated from August 2015 through June 2021, AR 2793–804; *see*
22
23

1 AR 2732, and he performed a general physical examination, during which he made these

2 observations:

> The claimant was alert, cooperative and oriented to time, place, person and
> situation. No distress. . . . Good historian demonstrating normal recent and remote
> memory. Normal attention span and concentration. . . .
>
> Range of motion (ROM) in cervical spine was full. ROM in lumbar-sacral spine
> was also full (the claimant demonstrated her stretching exercise[4]). . . .
>
> Normal shoulder shrug.
>
> No atrophy. No pronator drift. The claimant was able to raise her arms and legs
> antigravity without drift, able to stand from a chair with arms extended. During the
> evaluation the claimant used a lot of gestures demonstrating normal dexterity in her
> hands, lifting her upper extremities well above the shoulder level, demonstrating
> full strength in her hands and in the whole bilateral upper extremities. She had no
> difficulty extending her arms and hands to any directions. Normal holding of full
> bottle of water. Normal handwriting. The claimant was very energetic. She was
> standing most of the time of this almost two-hour evaluation. She was frequently
> changing her body position.
>
> Normal cerebellar exam and station. Gait was normal when the claimant was
> walking spontaneously, but variable on request. Normal tandem gait. Heel- and
> toe-walking was impaired on the left. Negative Romberg. No dysmetria or ataxia
> with finger to nose bilaterally.

AR 2792–93.

36.     According to Dr. Greenberg, plaintiff's impairments included "pain in multiple

sites including neck, lower back and left lower extremity, and dysfunction of the left lower

---

[4] The stretching exercises to which Dr. Greenberg referred appear to be diagrammed in notes
made by a physical therapist in October 2020. *See* AR 2413. Between August 4, 2020, and December 8,
2020, plaintiff engaged in physical therapy through Oregon Aquatic & Rehab Center and Pediatric
Therapy Services in Gresham. *See* AR 2412–16, 2420–22 & 2499–501. On December 8, 2020, plaintiff
reported that "subjectively she feels she is getting stronger and noticing more fluid movement."
AR 2500. Plaintiff further indicated that, the month before, "she had three incidences of her L knee
buckling, but she was able to immediately recruit muscles in the L leg to catch herself. She did have one
fall this past month, but this frequency is an improvement over previous months." *Id.* According to the
physical therapist's notes, plaintiff felt that "her near falls have significantly reduced due to her recent
attention to safety." *Id.* As of December 8, 2020, the treatment plan was for plaintiff to resume aqua
therapy once a week for four months. AR 2500–01. The Administrative Record contains no subsequent
physical therapy records.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11

extremity." AR 2805. His diagnoses were (i) spondylosis of the lumbar spine, causing lower back pain; (ii) cervical postlaminectomy syndrome, causing neck pain; and (iii) sequelae of demyelinating disease, causing neuropathic pain in multiple sites, including the left lower extremity, which also exhibited dysfunction as a result of both the sequelae of demyelinating disease and spondylosis of the lumbar spine. AR 2804–05.

37.     In response to a question about plaintiff's prognosis, Dr. Greenberg opined that "[b]ased on stable normal neurologic exam documented in the medical records of Dr. North from 2018 to present, and stable MRI findings from 2015, no progression of the claimant's condition is expected." AR 2805. He agreed that Gabapentin was a "reasonable and appropriate treatment for neuropathic pain" and that Baclofen was a "reasonable treatment for muscle spasms," but doubted whether Tecfidera, which plaintiff takes twice a day, *see* AR 2760–61, was "indicated" because plaintiff's medical records lacked enough data to determine whether plaintiff suffers from "stable Relapsing Remitting Multiple Sclerosis" or "the sequelae of monophasic demyelinating disease." AR 2805.

38.     By ten-page letter dated July 22, 2021, AR 3079–88, plaintiff's counsel submitted additional exhibits, including a letter from Dr. North dated June 25, 2021, AR 3089, a declaration by Marlene Brown (plaintiff's mother), AR 3090–93, and plaintiff's medical records from April and May 2021, AR 2809–3078.

39.     In her aforementioned letter, Dr. North opined as follows:

After my current assessment of [plaintiff's] condition and functional capabilities via in-person physical evaluation, [plaintiff] has a chronic condition and is unable to return to work full time regardless of occupation. Her functional restrictions and limitations indicated on June 25, 2020[,] evaluation have remained constant. It is my recommendation for long-term disability based on in-person office visit, June 3, 2021.

1
2

> Of note, a MRI of the cervical spine performed June 19, 2021,[5] reveals
> myelomalacia of the cervical cord at C3-4 from severe central canal stenosis. After
> objective medical evidence including recent MRI results and in-person physical
> evaluation, it is my opinion that [plaintiff] cannot reasonably or safely return to
> full-time work in any occupation.

3
4

AR 3089.

5

      40.     In her aforementioned declaration dated July 22, 2021, plaintiff's mother

6

corroborated plaintiff's subjective complaints. *See* AR 3090–93. Plaintiff's mother indicated

7

that plaintiff's dexterity has deteriorated, and she struggles to unscrew bottle caps, handle

8

glassware without dropping and breaking it, pick up small objects like coins, and write legibly.

9

AR 3090. According to plaintiff's mother, plaintiff cannot remain in one position for long

10

(sitting for "maybe ten minutes" at a time, and standing for "maybe five minutes" at a time), gets

painful cramps, and uses a cane, furniture, or a grocery cart to prop herself up while walking.

11
12

AR 3090–91. Plaintiff's mother added that plaintiff lacks the necessary concentration or

memory to complete tasks; she will forget that she is cooking and then burn the meal, forget that

13

she is doing laundry and then fail to put the clothes in the dryer, or forget to pay her bills.

14

AR 3091. In addition, plaintiff's mother referred to plaintiff's issues with incontinence,

15

insomnia, instability and frequent falls (at least once a month), poor vision, and slurred speech or

16

difficulty finding the right words. AR 3091–92.

17

      41.     On August 3, 2021, after reviewing plaintiff's counsel's letter dated July 22,

2021, and the enclosed documents (*i.e.*, Dr. North's letter, plaintiff's mother's declaration, and

18

certain medical records), Dr. Greenberg prepared an Addendum to his IME Report. AR 3145–

19

47. In the Addendum, Dr. Greenberg indicated that the additional materials did not alter his

20
21
22

[5] The MRI to which Dr. North apparently referred was conducted on May 19, 2021, not June 19, 2021. *See* AR 3034–35.

23

1    previous opinion.  AR 3147.  He explained that Dr. North's letter dated June 25, 2021, was

2    inconsistent with (i) the "normal findings" of her neurologic examination on June 3, 2021,

3    (ii) plaintiff's lack of complaint during the IME about any visual compromise, cognitive

4    impairment, or fatigue, and (iii) plaintiff's performance at the IME, during which she could stand

5    for almost two hours, was "very energetic," and exhibited a normal gait and "intact cognition."

6    AR 3146–47.

7         42.    In his Addendum, Dr. Greenberg noted that an MRI of plaintiff's brain on

8    May 17, 2021, showed no new lesions as compared to the MRI from November 2018, AR 3145;

     *see* AR 2997 (MRI results), and the new cervical and thoracic spine MRI, performed on May 19,

9    2021, showed no evidence of active demyelination, AR 3146; *see* AR 3034–35 (MRI results).

10   Dr. Greenberg opined that the "abnormal signal . . . at C3-4 level" in the May 2021 MRI was

11   "not relevant because the problem at that level was surgically addressed in 2019," that no

12   clinical-radiologic correlation existed for the abnormalities described in the MRI results, and that

13   normal findings by Dr. North on a neurologic examination "reliably ruled out myelopathy."

14   AR 3146.

15        43.    Dr. Greenberg also discounted plaintiff's medical records about rectal bleeding,

16   chronic constipation, and urinary incontinence because he did not believe that those symptoms

17   related to plaintiff's spinal surgery.  *Id.  But see* AR 2826 (indicating that plaintiff complained of

     having had "constipation since she had spinal surgery"); AR 2845 (speculating that the

18   constipation might be "related to her MS").[6]  Dr. Greenberg acknowledged that plaintiff has

19

20
_____

21        [6] Plaintiff underwent a colonoscopy on May 4, 2021, and was diagnosed with benign neoplasms
     of the ascending and sigmoid colon, rectal polyps, and diverticulosis of the large intestine without
     perforation or abscess.  AR 2877 & 2895–97; *see* AR 2862.  Plaintiff was discharged after the
22   colonoscopy with a recommendation to repeat the procedure in three-to-five years.  AR 2896.  The

23

chronic pain, which limits plaintiff's functional capacity, but he did not address the extent to which gastroenterological issues might affect plaintiff's ability to perform full-time sedentary work, presumably because those matters are outside his area of expertise. *See* AR 3146.

44.     By letter dated August 5, 2021, Reliance indicated that, based on an independent review of the claim file, the decision to terminate LTD benefits was deemed "appropriate." AR 365–71.  In its August 2021 denial letter, Reliance explained that its LTD Claims Department had determined plaintiff did not satisfy the criteria for "Total Disability from Any Occupation" because she was "capable of performing full-time sedentary work." AR 367.  The letter indicated that "medical documentation must substantiate that an employee . . . meets the [Policy's] definition of Total Disability," citing the following Policy language:  "The Monthly Benefit will stop on the earliest of . . . (1) the date the Insured ceases to be Totally Disabled; . . . or (4) the date the Insured fails to furnish the required proof of Total Disability."  AR 366; *see* AR 19.

45.     In denying LTD benefits, Reliance relied mainly on Dr. Greenberg's IME Report and Addendum, but it also expressed disagreement with plaintiff's counsel's assertion that plaintiff's lack of functional capacity to perform full-time sedentary work was "confirmed by Numerous Objective sources," as well as with plaintiff's counsel's interpretation of the Parr Report or PWPE.  AR 368–69.  Reliance discounted the June 2020 assessments by FNP Davies and Dr. North because they were "well before the termination of benefits" and the June 2021 opinions stated by Dr. North because they were inconsistent with Dr. North's own findings upon physical examination of plaintiff.  AR 369.  Reliance further noted that the PWPE indicated

---

Administrative Record does not reflect whether plaintiff continued to experience any constipation or rectal bleeding after the colonoscopy.

1   plaintiff "would do best in an environment where she can change positions frequently and take

2   periodic stretch breaks," *see* AR 2663 (Parr Report), and that "most if not all jobs do allow an

3   employee to take 'periodic breaks.'"  AR 369.

4       46.    On August 20, 2021, plaintiff commenced this action.  *See* Compl. (docket no. 1).

5       47.    While receiving LTD benefits from Reliance, plaintiff applied for Social Security

6   benefits.  *See* AR 367 (indicating that plaintiff provided Reliance a copy of her Social Security

7   application dated May 13, 2020).  In response to a Minute Order entered April 24, 2023, docket

8   no. 31, counsel have filed a Joint Status Report, docket no. 32, indicating that plaintiff was

9   awarded Social Security disability insurance ("SSDI") benefits, and providing a copy of the

10  written decision of Administrative Law Judge ("ALJ") Martha M. Gasparovich, which was

11  issued on October 26, 2021.

## CONCLUSIONS OF LAW

12      1.     The Court has jurisdiction under Section 502(e) of the Employee Retirement

13  Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e).  The parties do not dispute that

14  plaintiff may bring this civil action under ERISA.  *See* 29 U.S.C. § 1132(a)(1)(B).

15      2.     The parties agree that the applicable standard of review is de novo, and the Court

16  adopts their view.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006)

17  (en banc) ("When a plan does not confer discretion on the administrator 'to determine eligibility

18  for benefits or to construe the terms of the plan,' a court must review the denial of benefits de

19  novo . . . .  De novo is the default standard of review." (citation omitted)); *see also* Joint Status

20  Report at 2 (docket no. 5); Pl.'s Mot. at 4 (docket no. 24); Def.'s Mot. at 9 (docket no. 25).

21      3.     When reviewing de novo, the Court must "evaluate whether the plan

22  administrator correctly or incorrectly denied benefits."  *Abatie*, 458 F.3d at 963.

23

4.     Plaintiff bears the burden of proving that she is entitled to LTD benefits beyond January 22, 2021, when the applicable standard became as follows:  plaintiff "cannot perform the material duties of Any Occupation," AR 10.  *See Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) ("when the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant").

5.     A diagnosis, standing alone, "does not automatically amount to a finding that a claimant is disabled."  *Arko v. Hartford Life & Accident Ins. Co.*, 672 F. App'x 693, 694 (9th Cir. 2016) (citing *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability."), *overruled on other grounds by Abatie*, 458 F.3d at 969).  Plaintiff cannot satisfy her burden of proof by relying merely on her diagnosis of multiple sclerosis[7] and conclusory statements about the disease; rather, she must establish that her condition renders her "unable to perform an essential function" of a sedentary job for which she is qualified.[8]  *See Arko*, 672 F. App'x at 694.

6.     As in other ERISA cases, in this matter, the language of the Policy's "Any Occupation" standard is "not demanding."  *See Pannebecker v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1213, 1219 (9th Cir. 2008) (quoting *McKenzie v. Gen. Tel. Co. of Cal.*, 41 F.3d

---

[7] In its denial letter dated May 18, 2020, Reliance listed the following MS-related "deficits," which plaintiff's medical records did not reflect she had: "impaired gait, assistive ambulation device, muscle spasms, driving restrictions, neurovascular compromise, muscle atrophy or weakness, slurred speech, difficulty swallowing, escalation in MS medication regime, or increased frequency of specialist evaluation."  *See* AR 330–31.  Reliance also indicated that, unlike plaintiff, individuals with MS at a severity impairing work function typically have intravenous infusion treatments or hospital admissions for exacerbated flares.  *See* AR 331.

[8] Plaintiff contends that, because her condition did not improve, she remained Totally Disabled after January 22, 2021, but this argument lacks merit because, on that date, the standard for Total Disability changed.

1310, 1317 (9th Cir. 1994) (citing *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1308 (5th Cir. 1994))).

In *Pannebecker*, the Ninth Circuit interpreted a provision like the one at issue here as meaning

simply that the plaintiff was not disabled if she was "able to perform the duties of any occupation

for which she was reasonably fitted by training, education, experience, age, and physical and

mental capacity." *Id.* at 1220.  Vocational evidence is not necessarily required to establish that a

claimant can perform "some identifiable job."  *See McKenzie*, 41 F.3d at 1317.

7.      The Court's task is to "try the case on the record that the administrator had before

it." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999).  In doing so, the

Court may "evaluate the persuasiveness of conflicting testimony and decide which is more likely

true." *Id.* at 1095.  Unlike in the Social Security context, in ERISA matters, the opinions of

treating physicians are not, as a rule, afforded more weight than those of examining sources or

ERISA plan consultants.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).

Moreover, although plan administrators "may not arbitrarily refuse to credit a claimant's reliable

evidence," *id.* at 834, ERISA does not impose any "heightened burden of explanation on

administrators when they reject a treating physician's opinion," *id.* at 831.

8.      Although the Policy requires "satisfactory proof of Total Disability," AR 18, in

written form, *see* AR 15, which Reliance has interpreted as meaning "medical documentation . . .

[that] substantiate[s]" Total Disability, *see* AR 366, the Policy does not require objective (rather

than subjective) evidence of Total Disability.  *See Williams v. Reliance Std. Life Ins. Co.*, 164 F.

Supp. 3d 1230, 1249 (D. Or. 2016) (noting that the policy at issue "does not require that

'sickness' be established only by objective medical evidence," or "that the inability to 'perform

the material duties of Any Occupation' be established only by objective medical evidence,"

citing for comparison *Cooper v. Intel Corp. Long Term Disability Plan*, No. 3:13-cv-1852, 2014

WL 3895989, at *1 (D. Or. Aug. 8, 2014) (involving a policy that defined "disability" as "any illness or injury that is substantiated by Objective Medical Findings and which render a Participant incapable of performing work")); *see also Ettel v. UNUM Life Ins. Co. of Am.*, No. C07-906, 2008 WL 5186537, at *5 (W.D. Wash. Dec. 10, 2008) ("the Plan language does not required claimants to provide objective evidence of a disability").

9.      The Ninth Circuit has imported from the Social Security realm the principle that "individual reactions to pain are subjective and not easily determined by reference to objective measurements." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008); *see id.* at 873 n.3 ("disabling pain cannot always be measured objectively"); *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) ("'if the administrator had said, 'we will not accept fibromyalgia as a diagnosis unless you present objective evidence of it such as positive findings on x-rays,' she would have been demanding what cannot exist[,]' [and w]e now . . . hold[ ] . . . that conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious." (quoting *Jordan*, 370 F.3d at 877) (noting that fibromyalgia "cannot be objectively proved")).

10.     For purposes of ERISA claims, the Ninth Circuit has held that an employee must be able to sit for at least four hours in an eight-hour workday to be considered capable of performing "sedentary" work. *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016).

11.     Although two reviewing consultants indicated that plaintiff could sit for an entire eight-hour shift, *see* AR 1873 (Dr. Hoenig) & AR 2217 (Dr. Glass), Reliance's examining neurologist, Dr. Greenberg, estimated the duration of plaintiff's ability to sit as only "frequently," meaning one-third (2.67 hours) to two-thirds (5.33 hours) of the workday. *See*

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 19

AR 2806.  Given this IME finding, Dr. Greenberg's conclusion that plaintiff could work "on a full time basis as of 01/22/2021 and ongoing," *id.*, is somewhat inconsistent with the Ninth Circuit's holding in *Armani*.

12.     Because Dr. Greenberg did not opine that plaintiff could sit for at least four hours in an eight-hour period, the Court need not decide whether his assessment of plaintiff's functional capacity is more persuasive or credible than those of plaintiff, her mother, or her treating physicians.[9]  The Court notes, however, that Reliance does not accuse plaintiff of malingering, and the current record does not support any discounting of plaintiff's subjective complaints of pain.  Indeed, Dr. Greenberg acknowledged that plaintiff has chronic pain, *see* AR 3146, for which plaintiff takes 1000 mg of Gabapentin each day, AR 2792 & 2805 (indicating that "Gabapentin is [a] reasonable and appropriate treatment for neuropathic pain").

13.     Although Dr. Greenberg did not explicitly impugn plaintiff's credibility, the tenor of his IME Report and Addendum suggests that he believes plaintiff is more functional capable than she alleges.  Dr. Greenberg indicated that, during a two-hour evaluation, plaintiff never

---

[9] The Court agrees with Reliance that the June 2020 assessments by FNP Davies and Dr. North are not entitled to much weight.  The letter by FNP Davies describes plaintiff's diagnoses and course of treatment, but does not address with any particularity plaintiff's functional capacity.  *See* AR 1784–85. Dr. North's responses to the Functional Capacity Questionnaire appear internally inconsistent.  Dr. North estimated that plaintiff could stand for 30 minutes, but could stand or walk for a total of less than one hour, while needing to walk around for more than 15 minutes at 15-minute intervals.  AR 1774–75.  If plaintiff walked for at least 15 minutes twice each hour, as Dr. North indicated she "must," *see* AR 1774, then plaintiff would walk for a total of four hours in an eight-hour shift, which exceeds the limit on standing and walking set forth by Dr. North.  Dr. North further wrote that plaintiff could sit for only 10 minutes at a time and would need to lie down and rest for 20 minutes every half hour.  AR 1773 & 1775. In other words, according to Dr. North, plaintiff can sit for 10 minutes, then must lie down for 20 minutes, before repeating this cycle, which leaves no room for the more-than-15-minute walks every quarter hour that Dr. North stated were necessary.  Given the mathematical flaws in Dr. North's June 2020 evaluation of plaintiff's functional capacity, and the essentially "normal" results of Dr. North's subsequent physical examination of plaintiff, on June 3, 2021, the Court has disregarded the answers given by Dr. North on the Functional Capacity Questionnaire.

complained of fatigue, was "very energetic," and could stand for most of the time.  AR 2793 & 3146–47.  The Court has scrutinized Dr. Greenberg's written opinions, which were thorough, professional, and well-reasoned,[10] but concludes that plaintiff has carried her burden of proving that she could not, as of January 22, 2021, perform sedentary work full time.  Given the Policy language and Ninth Circuit jurisprudence, *see supra* ¶¶ 8 & 9, the Court must give due weight to plaintiff's subjective assertion that she cannot sit and use a computer or mentally focus for longer than 4-to-5 minutes at a time because of her pain, AR 2347.  Dr. Greenberg did not conduct any tests that might explain plaintiff's ability to sit for prolonged periods of time, and he did not unambiguously regard plaintiff as capable of sitting for four or more hours (*i.e.*, "constantly" or without limitation) during each workday.  His observation that plaintiff remained standing for most of the two-hour IME does not translate to a finding that plaintiff can sit and concentrate for the requisite amount of time to reliably perform sedentary work.

14.   Plaintiff criticizes Reliance and/or its consultants for failing to consider other limitations and issues, including plaintiff's difficulties with fingering and grasping items, how often plaintiff experiences falls and injures herself, the side effects of her prescribed medications, the extent to which a full-time work schedule would be interrupted by plaintiff's gastroenterological problems (*i.e.*, rectal bleeding, constipation, or incontinence),[11] and the

---

[10] Plaintiff's contention that Dr. Greenberg "unreasonably" failed to acknowledge plaintiff's MS diagnosis lacks merit.  Dr. Greenberg was not provided any medical records from the 2008 timeframe that might have supported plaintiff's MS diagnosis.  *See* AR2799–804.  Instead, he received documentation that recited MS as part of plaintiff's medical history, *see, e.g.*, AR 1786 & 3034, or as plaintiff's "chief complaint," AR 1779 & 2756.  Rather than accepting a diagnosis for which he lacked enough medical evidence, Dr. Greenberg identified an alternative diagnosis that might also explain plaintiff's symptoms: "the sequelae of monophasic demyelinating disease."  AR 2805.

[11] As indicated earlier, the Administrative Record does not indicate whether plaintiff continued to experience rectal bleeding and/or constipation after her May 2021 colonoscopy.  Moreover, although incontinence might have affected plaintiff's ability to perform her Regular Occupation, *see* AR 2082

1  number of days per month that plaintiff is projected to be absent from work.[12]  With respect to

2  fingering and grasping, Dr. Greenberg indicated that plaintiff has limitations; although she can

3  handle and accomplish a simple grasp constantly, she can engage in a firm grasp and fingering

4  only frequently.  AR 2806.  This assessment appears consistent with the Parr Report (or PWPE),

5  which evaluated plaintiff's grip strength as within normal limits and her manual and finger

6  dexterity as "below average."  AR 2662.  The Court is satisfied that the IME Report accurately

7  reflected plaintiff's fingering and grasping capabilities, and plaintiff has not proven that any

8  restriction in this area, standing alone, would render her unable to perform the material duties of

   Any Occupation.

9      15.    Dr. Greenberg was not asked to provide opinions about the expected frequency of

10 plaintiff's falls, the side effects of prescribed medications, or any anticipated absenteeism.

11 Although plaintiff's falls are not particularly well documented,[13] and the side effects of

12 medication and potential absenteeism are discussed by plaintiff's providers in only conclusory

13 fashion, *see* AR 1784 & 1777, the Court must conclude, given Reliance's failure to inquire at the

14 _____

15 (indicating that incontinence made "nearly impossible" working in a "bunny suit" and a "clean room"),
   plaintiff has offered no evidence to support a conclusion that incontinence inhibits her from engaging in

16 Any Occupation.

17     [12] Plaintiff also accuses Reliance of "cherry picking" plaintiff's medical records, citing cases from
   other districts that have admonished Reliance for doing so.  *See* Pl.'s Resp. at 2 (docket no. 27).  The

18 Court does not agree with plaintiff's characterization of Reliance's analytic method and rejects plaintiff's
   propensity rationale; any past "cherry picking" does not prove Reliance engaged in similar conduct in this
   matter.  *See* Fed. R. Evid. 404.

19     [13] Although physical therapy notes reflect plaintiff's self-reporting of falls, *see* AR 2416 ("fell on
   way to car to come to PT"), AR 2414 ("3 big falls in past month"), AR 2412 ("2 trips (hit the wall) caught

20 self on way to mail box [without] fully falling"), AR 2508 ("Fell down stairs, sat on seat & bumped down
   a few steps / yesterday.  Took bath, hit tail bone [when] leg gave out."), these notes concern only a limited

21 time period (from August through November 2020), do not reflect a particular rate of falling (*e.g.*, once
   per day or week or month), and precede a summary of plaintiff's own assessment that she was

22 experiencing an increase in strength, a reduction in the frequency of falls, an ability to "recruit" other
   muscles to avoid a fall, and better attention to her own safety, *see* AR 2500.

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 22

IME stage about or consider these subjects, plaintiff has carried her burden of showing that these issues preclude her from reliably working in a full-time capacity.  *Cf. Sacks v. Standard Ins. Co.*, 671 F. Supp. 2d 1148, 1165 (C.D. Cal. 2009) ("An administrator abuses its discretion when it fails to consider how the side effects of a claimant's medication impact the claimant's ability to perform her 'own occupation.'"); *Archuleta v. Reliance Standard Life Ins. Co.*, 504 F. Supp. 2d 876, 884 n.3 (C.D. Cal. 2007) ("The Court is not unsympathetic to the plight of insurers, who are undoubtedly wary of the potential for abuse by claimants on the issue of the debilitating effects of narcotic pain medications. . . .  However, an administrator may not guard against this fraud at the expense of participants who are left with the choice between debilitating pain (which would entitle them to benefits) and debilitating side effects of pain medications (which would also entitle them to benefits)."); *Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV-05-1622, 2007 WL 1624644, at *34 (D. Ariz. June 4, 2007) ("[A] total-disability determination cannot reasonably hinge on whether an employee is minimally capable, on a good day, at the right hour, of fulfilling her job duties in barely tolerable fashion.  Qualification for employment requires an ability to work effectively and to be reliable.").

16.     For the foregoing reasons, the Court concludes that plaintiff is entitled to LTD benefits for the period from January 22, 2021, to the date on which the Monthly Benefit will terminate in accordance with the terms of the Policy.  Although the Maximum Duration of Benefits would be until plaintiff reaches the age of 67, based on her Normal Retirement Age, rather than the Duration of Benefits calculated from her Age at Disablement, *see* AR 7–8, the Monthly Benefit must also terminate if plaintiff ceases to be Totally Disabled or fails to furnish the required proof of Total Disability, *see* AR 19.  Because the Court anticipates additional administrative proceedings concerning whether the Monthly Benefit should, in the future,

terminate for one or more reasons set forth in the Policy, the Court maintains jurisdiction over this matter.[14]

17.     The parties are DIRECTED to meet and confer and to file, within fourteen (14) days of the date of these Findings of Fact and Conclusions of Law, a proposed form of judgment, outlining the specific amounts owed to plaintiff and addressing the issues of prejudgment and post-judgment interest, as well as any set-off relating to plaintiff's SSDI benefits.  After judgment is entered, and the case is administratively closed, costs may be taxed under Local Civil Rule 54(d), and any motion relating to attorney's fees may be filed in accordance with Federal Rule of Civil Procedure 54(d)(2).

18.     Any Conclusion of Law denominated as a Finding of Fact shall be deemed a Conclusion of Law, and any Finding of Fact denominated as a Conclusion of Law shall be deemed a Finding of Fact.

19.     The Clerk is DIRECTED to send a copy of these Findings of Fact and Conclusions of Law to all counsel of record.

IT IS SO ORDERED.

DATED and ENTERED this 26th day of April, 2023.

John H. Chun
_____
John H. Chun
United States District Judge

---

[14] The Court notes that ALJ Gasparovich's decision to award SSDI benefits to plaintiff was based on an entirely different standard and analysis than is applicable to this ERISA matter.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24